Good morning. May it please the Court, my name is David Berrari. I represent the appellant Shane Mousseaux. He asks that you reverse the district court's admission of certain hearsay testimony and remand for a new trial. The admission of hearsay evidence in this case was an abuse of the district court's discretion, and particularly prejudicial because the case turned on the credibility of the accusers. In this case, we had no physical evidence substantiating or corroborating the accuser's story. There were no clothes, there was no DNA, there were no physical abrasions or medical examinations, no admission from Mousseaux, nothing that you would see in other cases that might justify, well, this is a harmless admission. Which of the two, just a little confusing with the protecting the identity of minors here, but which, were there two, and I'll use the word victims because we're post-verdict here, but I understand it. Was it two of them that testified here? Was it J.B. and J.B.T.? Did they both testify? And I'll tell you, the issue I think is hard for me is the harmlessness, whether or not the errors were, assuming there were errors, and there may not be, but I think that's a hard question, whether or not there was prejudice here. Sure. So there was the eldest child, and I'll use that term, eldest child, who is J.T.B. J.T.B., okay. And that is the victim, alleged victim of counts one through four, and I apologize for flip-flopping. The names were very difficult to navigate throughout this transcript. Was she the one on the incident on the couch? They both alleged an incident on the couch. She is the alleged recipient of the kissing, okay, if that helps clarify. And she testified? She did testify. She was the first witness. The second witness was J.B., who is the middle child, and she was the person who alleged a touching incident on that same couch after the alleged kissing incident earlier. And then there is also K.B., who I'll refer to as the youngest child, and she was the one who allegedly witnessed something. And she testified to that? She did. But she did not say there was kissing, is that correct? That's correct. That's correct. Which one of the three was the one that testified about kind of what the defendant said during the sexual conduct and things like that, that it occurred in different locations? Was that J.B.? That was the eldest child, J.B. Okay. Or J.T.B. J.T.B., okay, thank you. You move the question of prejudice. Here, I think it's important to draw the distinction between what is the prejudicial hearsay and what is the cumulative hearsay, because that seems to be really the issue is, as you identified, the alleged victims themselves testified to some of the conduct. But what was beyond cumulative in the sense of just those bare facts is the categorization or explanation of the disclosures, saying they're crying, saying they're doing these sorts of things. It's distinguished from Mackey, where they said that was cumulative because the victims themselves, the hearsay speakers, had already testified they were crying in their communications, that the mother was crying to the principal, those sorts of things. We just don't have that here. The middle child, her testimony at 73 through 74, and again at 85, was very limited about her disclosure to her aunt. And yet, when the aunt testified, she says she was crying five times at least. And so it's adding this credibility purpose. I didn't hear you. She was crying five what? The aunt testified that the middle child, when she was making the disclosure to her, was crying. She said that at least five times. And in Mackey, that's one of the, that's the point of the cumulativeness. They said that's cumulative because the child or the mother already said they were crying. And this is what's giving credibility to the claims, is this. That testimony was confusing to me because there's some conversation about crying and then there's some conversation about Terry. And so I could never tell whether we're describing an incident where somebody was just moved to overwhelming tears or if someone was just slightly weepy or, I mean, it was just hard for me to know what was going on. Was that plainer in the testimony itself? I was not live in the courtroom. Okay. So I don't know for sure. And there are multiple crying incidences that we're talking about, that we're talking about the crying of the youngest child. It wasn't described as crying. She had big eyes and maybe tears in her eyes, but not necessarily crying. And again, that was by the middle child. And then the bigger crying issue that I'm talking about is when the aunt is relating the testimony about the middle child's disclosure of this kissing, alleged kissing, and the conduct. Yeah, JB's testimony. That's where the issue really gets there. What they're doing is bolstering JB, the middle child's credibility. In a way that Verseer and Mackey doesn't allow. It's interesting because at the same time you're getting, you know, for these things, this sort of limiting instruction that says the purpose of this is for us to consider why were actions taken? Why were the reactions, right? You know, and ordinarily when you get that kind of a limiting instruction, you also get a instruction that says you're limited to what you can say. What did you observe? What caused you to go to the authorities? What did you see? What was said? And it's bang, bang, bang, and the judge steps in and stops most conversation that goes beyond that. And yet here, the judge tells the prosecutor that we're gonna have this really strict limit on it. We don't wanna wallow around in it. We don't wanna see it. And yet, it kinda looks like there's a little wallowing going on. And what's your view on how that makes this a very different harmless error analysis? Sure, sure. I think it's very different because here, the non-hearsay use is not a Trojan horse to allow in this other hearsay testimony and this credibility bolstering testimony. And the limiting instruction for what it was wasn't effective here because it goes beyond that, right? You can't accept it for the truth, but we're building the credibility with crying. Also, the district court is essentially abdicating its role to make this distinction. And where that's most evident is the questioning about the aunt describing the gesture the child made on herself. That's count five. The court allowed the victim or the aunt to suggestively show the criminal act as it was told to her by the child. That was objected to, but it was allowed. That had no purpose other than to illustrate the act itself. So the district court's limitation couldn't be followed by the jury because the district court couldn't even make the distinction between what was admissible for a proper purpose or not. This is entirely different than these other cases. This is exceptionally prejudicial because of the paucity of information that supports the claim. And because the family had a history of calling CPS to get those children out of the home on the mother, they're acting essentially as law enforcement because they're calling CPS repeatedly in this case. This case is too far. There was a thumb on the scale. The district court's limitations were insufficient to allow that. I see I'm running out of time. I'd like to reserve the remainder of my time if there are no further questions right now. I would say that these same arguments apply to the grandmother and her hearsay testimony about JTB, the eldest child's disclosures. Thank you. Thank you. Ms. Hoffman? Thank you, Your Honors. May it please the court. My name is Annie Hoffman, and I represent the United States in this appeal. The defendant Shane Musso here is making claims that the district court erred by admitting four separate statements in. One that came in as an excited utterance, and three that came in as a non-hearsay. Our position is these claims do not apply    and these claims fail and the conviction should be affirmed. I'm gonna dive right into the statement about what the youngest child, KB, said to her middle sister, JB, about what she saw when she went upstairs asking the eldest sister, JTB, to braid her hair. That was properly admitted as an excited utterance. JB, the middle sister, testified at trial that KB, youngest sister, came downstairs. She was scared. She looked scared. Her eyes were big. She had tears in her eyes. KB told her that the defendant, Shane Musso, was laying on top of JTB, the oldest child, the child who suffered the most sexual abuse at the hands of this defendant. JB told her that little sister said defendant was kissing JTB, the oldest sister, and that when she was seen, the defendant jumped up real fast and looked out of the window. The district court used its discretion, admitted this testimony under the excited utterance exception. I would note that at the time this event happened, KB, the littlest sister, she was only 11 years old, and what she saw scared her. She testified at trial that she didn't remember whether the defendant was doing something more than just laying on top of her oldest sister. She said she couldn't see it clearly. She didn't remember. Keep in mind, your honors, nearly two years had passed between this incident and when trial happened. But KB, the little sister, did remember that she was scared at what she saw because she thought the defendant, Shane Musso, the man that she considered to be her stepfather, would do the same thing to her and her middle sister, JB. And I think it's worth noting that at this point in the trial, your honors, the jury had already heard testimony from JTB, that oldest sister who suffered most of the abuse. JTB was the first witness on the stand. She described in detail, in very distinct detail, the specific sexual acts of abuse that this defendant committed against her. So the jury had already heard that. And it's very clear that something happened on that couch, something that frightened the little sister. She talks about how she saw the defendant, Shane Musso, laying on top of her biggest sister. And that biggest sister was laying there frozen and like she was stiff. JTB, when she testified, she said that something happened on the couch when her youngest sister, KB, walked in. Even the defendant's own words, when he was interviewed by the FBI special agent, he came with a story about how that instance when youngest sister, KB, came into the living room, the oldest sister, JTB, came, quote, flying in out of nowhere to lay down on the couch, just as the defendant was about to lie on the couch. And then Musso told the FBI agent, after that happened, I got really close to her face to look at JTB's braces. So that was the story he came up with to explain why he was so close on the couch, on top of oldest sister, JTB. And yes, when KB testified at trial, again, after her two older sisters, then came KB. KB did not testify about the kissing. She said, you know, she didn't remember what else happened. The defendant chose not to cross KB on that. But the defendant did argue at closing that KB had exaggerated the event and that that gave middle sister, JB, some biased lens with which to view the defendant. I would argue that this didn't bolster anyone's credibility. If anything, it perhaps undermined the girls' credibility, which is what the defense attorney argued at trial. And so I don't think it was error to admit that statement under the excited utterance, exception to hearsay. But even if it were error, I think it's harmless based on all those factors, based on what the jury had heard at that point. I would like to turn to now the non-hearsay statements, the three non-hearsay statements that the district court admitted. Two of them occurred in a car between auntie BB and middle daughter JB. Auntie BB testified after the three girls testified. So again, the jury had already heard JTB talking about a year and a half of abuse, sexual abuse. She suffered from shame move. So jury had already heard from JB talking about the grooming behavior that defendant Musso engaged in with her and how. Did BB testify that JB was crying when she made these statements? I think the conversation in the car. My recollection, Your Honor, is yes, that. Why was that permissible? I mean, I don't understand. I mean, Judge Erickson had asked earlier, oftentimes a district judge will limit that testimony if it considers it non-hearsay. But why was that permissible to allow the witness to go into those sorts of issues? And that brings us then to the question of whether, if there was an error, whether it was harmless or not. So for that statement, BB's testimony was that she had picked up JB because JB was gonna do some babysitting for Aunt BB's child. JB jumps in the car. And I think it's important to set the context because this was a spontaneous disclosure is how I would characterize it. So Auntie's in the car with JB. JB starts crying and says, Auntie, I'm scared. And then she just blurts this disclosure out. And what was the purpose of the evidence? Was it to indicate, I mean, I forget why the district court admitted it as non-hearsay. Was it to explain BB's reporting actions later on? Yes, Your Honor. So these next three hearsay statements were all offered and admitted to show how the investigation began. Why does it matter that she was crying? Your Honor, I guess I would argue that that's non-hearsay too. That's an observation of how the child appeared. And I don't think it is bolstering because the jury saw the child testify the day before and saw her on the stand. She was emotional on the stand. And so I don't think that is prejudicial. But isn't it arguably bolstering that, I mean, it's one thing to be emotional on the stand under cross-examination, but here you have bolstering that suggests, no, she was closer in time to the alleged offenses. She was also emotional. Isn't that bolstering? I would disagree with that, Your Honor. I think it is context for how this child appeared and how this spontaneous disclosure came out. I also think it goes to- Did it matter that the, did it matter for the purposes of why it was offered that it was spontaneous? The disclosure of the child? Correct. I don't see, you know, the fact that BB heard this, I see the relevancy. But the additional facts about how it came about, going back to Judge Erickson's question, don't seem at all relevant to that issue. Well, Your Honor, what I think cures this, if the court does view it as error, is that the judge, the district court, gave a limiting instruction before that information was received. So before the toothpaste was even out of the proverbial tube the district court specifically said, I am receiving this for a limited purpose. Ladies and gentlemen of the jury, you can only consider this for what the witness did with that information and how it led to an investigation. And almost always when that happens in a courtroom, the limited instruction keeps the defendant from offering, or the proponent of the witness, the government, whomever, from offering anything other than the statement is that so-and-so was in my car. She seemed upset. She told me what she was upset about, and it involved her father. What did you do next? I made a report, right? We don't go into the, were we crying? Who was, you know, how did the conversation take place? Where, you know, you have where it is, but you don't go into great detail about the reactions. Then I said this, then they did this. I mean, it's become something that seems far more evidentiary as to the underlying crime than it is just explaining why I called the authorities. And Your Honor, I would say that because the jury was instructed before any of this came in, they were well aware for the purposes for which they could use it. But at some point, we do say that it gets to the point where it's just so much that it's just not, to presume that they're gonna follow that instruction becomes much more difficult. I understand, and there's nothing in the record to show that the jury considered this for anything more because we have that one statement made in the car. What could possibly show that? Well, they're looking- We have a verdict, we have the evidence, and then we have the verdict. And you're saying there's nothing to show that, that makes no sense at all to me. Just, Your Honor, I was just trying to say there's, we have no indication that the jury considered those statements for anything more- How would we have indication? But all we have is the victim testimony, right? The testimony of two victims, the corroborating characteristics that were observed by family members, some of these suspicions- That's right. About some of the victims struggling in school and that sort of thing. Yes, and suspicious circumstances. For example, when the mother testified that she came home unexpectedly from work and she saw the defendant and JTB, the oldest child, like on a mattress in the living room floor with a blanket over them, and she comes home unexpectedly and he jumps up and denies anything having happened. So, yes, this is a historical child sex abuse case. It is distinguishable because of the multiple victims and some of the corroborating information that we have in this case. And ultimately, Your Honor- Ultimately, the question is, why did Judge Lang say he really wanted this testimony limited and then the government went ahead and offered all this stuff? I mean, why did the government fail to follow? And, I mean, there's another question is, why did Judge Lang not intervene? But the question is, like, he said that he didn't want this to become anything beyond what was necessary to justify the reporting. And yet, we get this. It seems like the government intentionally offered this evidence. And my experience tells me, and I've tried a lot of cases, is that that happens when the government's got a circumstantial case and they're worried. And that's when they dance on the edge and go beyond what the judge's limiting instructions are. Your Honor, I would dispute that the government did this intentionally. I think the record shows that the government asked the question and then Auntie B.B. entered into sort of a narrative sort of question that wasn't interrupted by the government. I will agree with that. Well, you never did no effort to bring them back on, bring Auntie back onto task. No indication just to answer the questions I've asked. Right? I mean, this is just allowed to come in as a narrative that's going way beyond what the judge intended originally. That's correct. And the district court did step in and say, we've gotten a narrative. I will note that the defense attorney did not object to this. It was the judge who stepped in. And I agree, Your Honor, the government didn't step in and stop that narrative. It was the judge who did it. And then the case moved along. And then just touching on, just real briefly, the non-hearsay statement to Grandma that J.T.B. made to Grandma. I think that was also properly admitted because that was the oldest child who, up to this point, had not disclosed anything. And she was the one who had suffered the worst sexual abuse at the hands of this defendant. She discloses to Grandma simply the phrase, he had sex with me. There were no further details offered. The jury was properly instructed before that statement came in. So again, the district court, for all these non-hearsay statements, instructed the jury specifically. That was admitted for what reason? I mean, there was already a police report given. I guess that was admitted for the Grandma's, the explanation for the Grandma's involvement in the ultimate reporting, is that right? Yes, Your Honor, because up to that point, up until the point when oldest child disclosed to Grandma, the family knew that there was something with middle child J.B. She had disclosed to Auntie. And she had disclosed what little sister K.B. had seen. But we hadn't, the family didn't know the breadth of the sexual abuse until J.T. And so that does not go, you're way over your time, and I don't want to answer the question, but then we don't go on with more untimely argument. Understood. I would respectfully request that this court affirm in all respects. Thank you. Thank you. What about, if I may, J.T.B.'s statements to L.B., or L.B.'s testimony? I mean, that seems less problematic, perhaps. Do you agree with that? It has references to crying, I was holding her, those same sort of things. It also has identification of the witness and exactly what she said. Also, this is coming on the heels of sort of the two girls' credibility runs together because of the order of the disclosures. And also their history of running away from their mother, the problems with the mother, the CPS involved. All of this is speculation that I hear from the government about what they saw with, oh, it must have been, she was doing bad in school, wearing baggy clothes, got pizza, there's no allegation that anything happened outside of the home, and yet the mother is saying, oh, maybe something happened on these pizza runs. This is all hindsight. It's not supporting the actual claim. This is just about the credibility of the girls. And this wasn't a spontaneous disclosure. These disclosures came the day after the girls got into a fight and the eldest child broke the middle child's finger. This was in response to being in trouble. And we know from Marrowbone that that's problematic. We also know that the family had told C- You're out of time and you're just retrying the case for us. So I think if you've got enough, if you've got one more point that's on track with what we've been hearing the argument, that's fine. Otherwise, let's call it a day.  That would go to the spontaneity and the reasonableness of, or why this wasn't admissible as hearsay to explain what they did later. With all of that, we would ask that the court reverse the district court's orders. This was too prejudicial and remand for a new trial. Thank you. Thank you, counsel. Case has been well briefed and argument's been helpful. We'll take it under advisement.